Good morning, counsel and colleagues. I take it that Judge Berzon and Judge Callahan are on the line. Yes, I'm here. Judge Callahan's here. And that counsel for both parties are present? Yes, Your Honor. This is Michael Pichetto from the Federal Public Defender's Office, representing the applicant to be next for in. And, Your Honor, this is Bob Whelan from the Office of the Attorney General of the State of Nevada, representing respondents. All right. Thank you, counsel, for stating your appearances. We appreciate your being available for argument this morning and by telephone. While the telephone works, as we all know, it's not perfect, so I would encourage the participants to use the mute button when not actually talking so that background noise or paper shuffling or whatever doesn't disrupt the transmission. And, of course, to be somewhat alert to being interrupted by questions or comments from the panel. That said, 30 minutes aside, allotted for argument. The clock will start running down when we start. And if you want to reserve any time, Mr. Pichetto, for rebuttal, you'll just have to stop with time remaining. So if you're ready, we're ready to hear you proceed. Thank you, Your Honor. May I ask first, is this an acceptable level? I always feel like I'm bellowing into these phones. It's quite clear for me. Thank you, Your Honor. May I please the Court? I think that we can approach the issues in this case easily by following, I think, the structure of Judge Reimer's dissenting opinion in Miller v. Stewart, a position that ultimately prevailed when the Supreme Court vacated the stay in that case that was imposed by the majority. And I think that the distinctions between that case and this case make it clear that this is a case in which a stay should be granted and in which next friend's standing should be accorded. The first question addressed in that opinion is whether there is any meaningful evidence of mental incompetence. And that's the standard under Demosthenes v. Ball, Whitmore, and numerous other cases. And this is an issue on which I think it's quite clear we have a different case. In Miller, the situation was there was a diagnosis of substance dependence and possibly antisocial personality disorder. Here we have an uncontested diagnosis of a major mental illness, a bipolar II disorder, which includes, according to the testimony of Dr. Bittker, chronic depression. Now, this is not the kind of evidence that has been challenged in other kinds of cases. In Miller, for instance, the attempt by the next friend to obtain standing was supported by what Judge Reimer characterized as speculative declarations about the deterioration in the individual's mental state. Those were, as the judge pointed out, doctors who had not seen him recently and declarations from the proposed next friend and a lawyer who were also laypeople. This is quite different. The only mental health professional who has examined Mr. Dennis for the purpose of determining whether or not he is competent to waive his right to further proceedings and seek his execution is Dr. Bittker. Dr. Bittker was chosen, was actually proposed, not by the defense, but by the state court district judge in the course of the state proceedings. If you look at Volume 2 of Respondent's Excerpt at 367, this was a doctor who was not proposed by counsel for Mr. Dennis but by the court. He's a doctor who, according to his testimony, is mostly used by prosecutors. Counsel, can you hear me? Yes, Your Honor. Okay. Isn't the problem here not whether there is or was a major mental illness but rather what the impact of that major mental illness was and whether, after Goodwin v. Moran, it conforms with an applicable standard with regard to competence in this particular circumstance? Your Honor, that goes to the heart of the legal issue, I think. In Goodwin v. Moran, whatever language was used by the court, it did not overrule Reese v. Payton. And the standard that is stated in Reese v. Payton is whether the individual suffers from a mental disease, defect, or disorder that substantially affects his ability to make a rational decision. There is no case that has overruled that, and I don't read Godinez as, in fact, overruling it. The language in Godinez seems to say that that ability to make a rational choice is subsumed in the part of the Dusty standard that is where the individual has the ability to rationally consult with counsel. That's not, I think, a particularly natural reading of the substantially affects standard, and it's clear that it has caused some confusion. Our position is that whatever standard is actually applied, Reese still guides us in the direction of determining whether or not this disorder does affect the choice. And there's no question about that on the evidence in this case. Dr. Bicker was quite unequivocal that this decision was, as he put it in his initial report, quote, directly a consequence, unquote, of his mental disorder. Mr. Perceva, this is Judge Reimer. The difficulty that I see with that, and assuming you're correct, because I believe you are, that the Reese standard is the one that governs in this circuit, there is a difference between a decision which is the product of a mental illness, that is the direct consequence of a mental illness, and the individual who made the decision's capacity to make it rationally. I'm afraid your honor may be too subtle for me on that point. As I read the standard, the question is, does the individual have a mental disease, defect, or disorder? Clearly that's satisfied here. Does it matter whether it's a defect, disorder, or illness? I think that phrase is used pretty much on block. I don't see any indication in the cases that there is a distinction amongst those individual components, and certainly no such distinction is made in Reese. But I think the point was that if that disorder substantially affects the individual's ability to make a rational choice, that that standard is satisfied by Dr. Bidker's testimony here. His testimony is, it's not a volitional choice. It is a choice that's not affected by Mr. Dennis' environment. It's essentially an E-Day fix, and that, it seems to me, does go directly to the question, does he have an ability to make a rational choice? Well, Dr. Bidker, given the direct opportunity to express that opinion, didn't do so. I think that that, I don't, well, we may have to disagree about that, your honor, substantively, but it seems to me that when the court asked Dr. Bidker, and this is Volume 11 of our excerpts in 1859 to 1860, the court asked, and in your judgment, is he capable of volitionally making a rational decision in that regard? Dr. Bidker answers, I believe in this case, this is the one area where I don't think it is a volitional decision. I think it's a fixed decision that has been sustained since the instance of Fentz and before. And later on, on 1860, in answer to my question, he says, do you believe this decision on his part is, in fact, a product of his mental disorder? The answer is yes. And I don't know what script we could have Dr. Bidker follow that makes it any clearer than that. Well, for him to say it could be a product, it was a product of his mental illness, and he lacked the present ability to reason through it and make an intelligent decision. That's what he didn't say. Well, in that case, it's my fault for creating this record, Your Honor. But it seems to me that if what we're looking at is the restander, does this individual have a disorder that substantially affects his ability to make that decision? When Dr. Bidker says it's a product of his disorder, this decision is a product of his disorder, which he says three or four times. But it could be a product of a whole lot of things, the disorder, you know, the weather. Your Honor, he does testify at page 1859, but it's not affected by his environment. It's not a question of him reacting, of Mr. Dennis reacting to his environment. He's reacting to his disorder. It's not a product of rational thinking. It's a product of rigidity, and it is a product of his disorder. That's at 1858. All right, then let me ask you a slightly different question, if I may. Dr. Bidker also was very clear in stating that Dennis understood everything that was going on, was perfectly with it, had been on medications, his medications controlled his mental illnesses. So how do you square those findings with your interpretation? I think it's the distinction between intellectual understanding and what Dr. Bidker characterizes as volition, will, if you prefer. It seems to me that there is a difference, and I think this is where the language of Reese goes straight to the issue, is does the disorder substantially affect his ability to make a rational decision? Now, we assume for the purpose of this argument, and I conceded below and I concede here, we are not saying that Mr. Dennis is intellectually incapable of understanding his situation. That's not an issue. I think that the distinction that we are trying to make is, all right, given this array of choices which he intellectually understands, is his choice a product of his own free will, his volition, or is it a product of his mental illness? And that, I think, is where the point in this case is, if under the language of Reese it is even substantially affected by his disorder. Mr. Prosciutto, why do you need to emphasize substantially affected language? That's certainly problematic since the first half of the sentence is Reese's having, the second part does, and there's been a lot of quartering of the bridge since then, but even if you took the Rumbaugh formulation, that is, the prevent formulation, aren't you in the same place? Your Honor, I agree, but I think it's important to emphasize the fact that, given the fact that this is expert testimony about an individual's mental illness and its effect on his decision-making process, I think the more careful and astute and credible a psychiatrist or psychologist's opinion is going to be, the less adamant they are going to be about saying, this is 100 percent, there is no wiggle room, it's absolutely certain. When you're done, this is Judge Callahan, I wanted to ask you a question. Certainly, Your Honor, please. Well, assume that we accept your interpretation of Dr. Bitker's testimony. Is that just the end of it, or can the district judge weigh that against the district judge's view of longstanding contact with Mr. Dennis, and is the district judge free to not believe parts of that testimony? I think that goes to the other critical issue in the case, Your Honor, which is, what is the other evidence? And this is not a case like the other cases that are discussed, that are cited in our briefs, like Demosthenes, like Miller, where there is a dispute about what experts say about what the individual's state of mind is. The only mental health professional who has seen Mr. Dennis in the past five years and was asked to give an opinion about this particular issue says, this is not volitional, this decision is a product of his mental illness. But the court also did have contact with Mr. Dennis in a legal capacity over a period of time. I guess what I'm saying is, does the court have to accept that, or can the court weigh that against the court's view of Mr. Dennis? Well, I think that is a question that is the problem, and this goes back to Judge Reimer's opinion in Miller. Because Judge Reimer pointed out in that case that some of the declarations were just lay people. There was a lay lawyer, and there was the next friend, and their opinions were quite heavily discounted. And if you look at the cases that we've cited, Locos v. Capps and Lafferty v. Cook, the question really is, what are the limits of a lay ability to recognize these symptoms? And the language in Locos, which we've cited, is that you don't have to be, quote, catatonic, raving, or frothing, unquote, to be incompetent. And this is an issue which is very important, because I will concede, looking at Mr. Dennis, he looks perfectly lucid. And the question really is, is this court going to say, well, Locos v. Capps is wrong, Lafferty v. Cook is wrong, if a district judge, over the course of an hour or two hearing, says, well, he doesn't look incompetent to me. Is that adequate to overcome uncontradicted mental health expert evidence that the decision is, in fact, based on the mental illness? And let me give you a cite to a case that's cited in Lafferty. Unfortunately, I regret and I apologize it didn't make it into our briefing. It's a case called Strickland v. Francis. It's 738 Fed Second, 1542 at 1552. It's an 11th Circuit case from 1984. It certainly hasn't been adopted in this circuit. But let me quote, it is well established that a fact finder need not adhere to an expert opinion on incompetency if there is reason to discount it. However, whereas here the expert testimony so clearly and overwhelmingly points to a conclusion of incompetency, the jury cannot arbitrarily ignore the expert in favor of the observations of layman. Mr. Pichetta, first of all, because of the telephone thing, it's difficult to interact. Several times I had questions, but you probably couldn't hear me. So if you could slow down a little, maybe we'll be able to get. I beg your pardon, Your Honor. It's not your fault. I think you didn't hear me. But if you spoke with a little more pauses, maybe you wouldn't. The question I was going to ask is whether the procedural question here, i.e., the way in which the district court, the state district court's conclusion to disregard or to credit Mr. Dennis over Dr. Bicker in some respect. Well, Your Honor, we cited Taylor v. Maddox, which is, in which Judge Kaczynski's opinion is, I think, the lightest word from the circuit on the presumption of correctness. Here, it's quite clear that there was no adversary proceeding in the state district court. The state district judge heard essentially only one side. And I point out, just in passing, that the district attorney in the state proceedings objected to any consideration of the language of the re-standard at all. So, clearly, there is some possibility of confusion between the re-standard and the dusky standard, as those two are conflated and convened. What about the fact that both the attorneys, attorney for Mr. Dennis and Mr. Dennis, and also the prosecutor, just wanted to submit Dr. Bicker's report on the report itself? Yes, Your Honor. It wasn't a situation where either side said, no, we want Dr. Bicker there, and we want to cross-examine him. Obviously, there are times that the report might be the best that you have, and submitting someone to cross-examination might erode on the value that the report provides. It seems to me on the record that no one wanted to have him cross-examined, and while you would like that now, why is that a due process problem? Because, quite simply, when you say there were two sides represented, I think that's, on the circumstances of this case, inaccurate. Because it was clear that certainly the district attorney's office wanted Mr. Dennis found competent and allowed to choose execution. Counsel for Mr. Dennis took the position that he was going to follow Mr. Dennis' wishes, which was that he wanted to be executed, and he wasn't going to do any litigation that was contrary to those wishes. So what you have here is an archetypal problem with non-adversarial litigation, which is it's necessarily unreliable because the court hears only one side of the story. Now, Dr. Bicker's report, which was quite clear about this decision being directly a consequence of the mental illness, I think that should have alerted the state court judge that a further hearing was required and that Dr. Bicker should be brought in. I mean, if you look at one of the progenitors of all of these cases, the drug versus Missouri, the Supreme Court said this has to be a nuanced inquiry. And what we have here is a situation in which the state court heard only one side of the equation. And, again, to advert to the previous question about delay observations of the district court, both the state and the federal district court, it's clear from Dr. Bicker's testimony that this is not something that is necessarily going to show just from looking at it. Dr. Bicker concedes, as we've conceded, he's not raving and frothing or catatonic. What he says is, is he demented? No. Is he delirious? No. Is he psychotic? No. So the things that we would naturally assume we would be able to recognize as signs of mental illness, that's just not the kind of condition that Mr. Dennis suffers from. What prescriptively ought a state trial court looking into these kinds of questions do procedurally and do you have any authority which explains that? Well, I think that as the practice in the United States Supreme Court has been, when a prevailing party does not seek to defend a judgment in the United States Supreme Court, that court routinely appoints an amicus curiae to take the opposing position. I think that would have to be the minimum. I think when you have a situation as here where there is a clear indication in the only expert test evidence in front of the court that there is a question, and I think more than a question, I think that there is clearly something that shows that the decision is within the standard of reason, then it's incumbent on the state court to respond to do what Drove suggests, to make that nuanced inquiry, to appoint another expert, to bring in the expert, to clarify, and I think we would have avoided the necessity of having the hearing in front of Chief Judge Crow if that had occurred in the state court. The reality is that no matter what in an ideal world you believe the state court could have done, it was done in the federal side. So Bicker testified. He testified he would have testified the same way had he testified in the state court. And so now we have the total mix, right? We have a mix, Your Honor, but I think we have the same basic problem both with the state hearing and with the federal hearing, which is a lay judge without any contrary expert testimony says essentially he doesn't look crazy to me. Well, no, that's truly not what either judge said. I mean, in fairness to each of them. I don't. I am certainly overstating it, Your Honor. By quite some measure because what they did was say, you know, I think every judge who's ever been on the trial court has done precisely the same thing in competency determinations of all sorts. The court engages in a colloquy. The court considers all of the medical or psychological, psychiatric expert opinion that's there and makes the call based upon the entire array of information available to it. What case says that's not okay? I don't think there is a case that says that's not okay, Your Honor. But I would ask you to consider your own experience. Did your honor on the district court bench ever have a situation where the only evidence in front of you, the only expert evidence was a psychiatrist saying this decision is not a rational decision. It's a product of his mental disorder. It's not delusional. And your honor decided to go no further than to listen to the individual's responses and say, well, there's no question here. And that's, I think, where we are in this case. And I don't mean no disrespect to Chief Judge Perot or to Judge Berry in the state court. The problem is Mr. Dennis does look very lucid. He presents very normally. I would not think personally that he was incompetent. But that's why we have experts, and I have to accept that I'm not a psychiatrist. And if Dr. Binker, who is the one who has the training and the expertise, which he does particularly in the field of depression, says this is the link between his decision and his disorder, I certainly cannot say from a lay perspective, looking at Mr. Dennis and hearing him talk, that that's wrong. And I think that's the problem that we have here, is that I don't think either the state or the federal judge was in any better position. Respectfully, I think I'm almost out of time. Could I save a minute or two? Certainly. Thank you, your honor. And we'll hear from Mr. Wieland. Please, the court, counsel, this is Robert Wieland. I'm a senior deputy attorney general representing respondents in this particular matter. I would suggest to the court that there are two somewhat interrelated questions that are being propounded in this particular action. The first being that if a person is said to have suicidal ideation, and we are not conceding that the state district court accepted Mr. Dennis' representation, that since he has been in prison he has not felt suicidal, I direct the court to the excerpt of record, page 1658, does that make him incompetent to waive further proceedings when that person has a rational understanding of what is going to happen and knows why he's going to be executed? The second leg of that is that are there two separate standards for competency, one for someone who is fighting execution and one for someone who volunteers? I would suggest to the court that there is simply one standard for competency, but goes argument of this action, that is, if a person is fighting execution, he is per se competent, but on the other hand, that an individual is per se incompetent if he is not fighting execution because he is suicidal and therefore, by their definition, cannot make a rational choice. That is not the argument here, as I understand it. We have a situation, do you dispute that this person, Mr. Dennis, does have a cognizable mental disorder as found by Dr. Bittker, i.e. bipolar disorder, including chronic depression, leaving aside the suicidal ideation of a particular manifestation of it? Your Honor, the state court worked on the assumption that he did have bipolar disorder and the other defects, if you will, that were reflected in Dr. Bittker's report. So he then testifies that this decision is essentially not a volitional one, which I take to mean it's not really a choice. It's really somehow a linear result of his disorder. Is that not – and your position, as I understand it, is that it's not relevant to our decision. That's your ultimate position. That's correct, Your Honor. If Your Honor is concerned about what evidence there is that demonstrates that this is, in fact, a volitional decision, I would direct the court to – What I'm trying to do is I'm trying to understand your legal position. Your legal position is, assuming that to be true, it doesn't matter. That's correct. And could you spin out why – I've been struggling with this myself because we have – every court still continues to cite Reed after Godinian. It doesn't seem that the district court here purported to apply Rompau, which does have a third prong which seems to be directed to a consideration of that kind. So how do we simply get rid of it? Well, Your Honor, the state district court did, in fact, make the consideration and did, in fact, address the issue. Indeed, if Your Honor looks at the excerpt of record at page 16 – I understand that. You're making a legal argument, which is that that's all unnecessary. And certainly, if you're right about that, we can make this case much simpler. We don't have to worry about what the evidence is and we don't have to worry about who found what. We don't even have to worry about the failure to have Dr. Bickford testify in the state court or the fact that the district court deferred to the state – the federal district court deferred to the state district court because the only thing that's in dispute is this prong, and if it doesn't exist, we don't have to worry about anything. Well, yes, Your Honor, and I think the prong is actually an unnecessary outgrowth. I would direct Your Honor's attention to Godinez v. Moran at page, which is – All right, and I know there's a footnote that makes some comments about the rational choice language, and I was – Yes, Your Honor. It said the United States Supreme Court – That case was 14 years ago, I think, and that since then – it was 10 years ago, whatever it was – and since then, every court, including ours, has continued to cite Reed, and several of them have continued to cite Rombaugh. So what is the state of the law at this point? Well, I think the state of the law is that if this individual has a – he knows why he is being executed, and he has the ability to make a rational choice, that's the only inquiry that needs to be made. But rational choice is somewhat different from the dusky standard and the one reflected in the state court case that was the subject of the state Supreme Court's original remand. And those seem to be simply the same as a competency to stand trial and deal with cognitive functioning and not really choice-making. Am I wrong about that? Well, Your Honor, if you look at – and this kind of dovetails into Mr. Pachetta's argument that this circumstance was not adversarial, a point that we vehemently disagree with, but if you look at a circumstance where an individual is entering a guilty plea, the circumstances certainly are adversarial, but they may not be confrontational, I guess, as Mr. Pachetta would have it. But if an individual is competent to enter a guilty plea, I would suggest to the court he is most certainly competent to having, under a guilty plea canvas, knowingly, intelligently, and voluntarily waived his constitutional rights to a trial to confront and examine witnesses, that if you make the same inquiry and he's got the same competence to do that, he most certainly has the ability to say, I don't want to proceed any further with my appeal. Well, there's certainly one big difference in the death penalty context, which is that one is totally irrevocable and the other one is not, right? In other words, the guilty plea is still subject, as it would have been subject here to some inquiry on habeas with regard to the voluntariness of that plea. But this decision, if it goes forward and if the next French petition doesn't proceed, is never going to be questioned. Your Honor, I think that's a difference without a distinction, because the point being that a voluntarily entered guilty plea, if it meets all the criteria, is not revocable in any instance in any way. So in each circumstance, assuming the adequacy of the canvas and the other things, they are equally irrevocable. Well, Mr. Whelan, suppose that Dr. Bidker's testimony can be interpreted in only one way, and that would be that the suicidal ideation is a direct line from that to his wanting to give up his appeals and challenge his death verdict. So it's not a volitional decision. It's a result of his mental illness. Assume that that's what doctors, for this moment, that that's Dr. Bidker's testimony. Is the state court allowed to look at anything else? Can the state court rebut that or disregard it if there's other evidence? Certainly the court can. The court can behave as any fact finder. No fact finder is required to accept any expert's testimony on anything. Indeed, in this particular case, and indeed as the state district court cited in its order and verbally before it entered its final order, it was considering all of its long dealings with Mr. Dennis' case, the long history of Mr. Dennis appearing in front of it, the previous adjudication that Mr. Dennis was competent to stand trial and to enter his plea, that he was competent to stand for sentencing. The court had a plethora of information in front of it. Now, Mr. Dennis said that he hadn't been suicidal since he started taking the medication. It seems there was no evidence in the record that he had tried to commit suicide since 1995. Is that correct? I believe that's correct, Your Honor. I think that's what the record reflects. I think the record reflects that at least since he had been in prison, he had not had any suicidal ideation or attempts. Was that a factor that the state court considered relative to Dr. Bittker's testimony that his suicidal ideations were fed directly into his desire to withdraw his appeal? The state district court said, and I would direct the court's attention to page 1658 in the excerpts of the record. The state district court said, based on Dr. Bittker's report and all other evidence before the court, the court finds Dennis does not suffer from any disease or mental defect that prevents him from making a rational choice among his various legal options, including whether to pursue any further litigation that may save his life. But what has really troubled me in my mind on the state district court is that the trial court judge expressed a fair amount of confusion. I don't mean confusion, but she could not quite understand what Dr. Bittker was saying, but she didn't ask him. He wasn't brought in to testify, even though the original plan was to bring him in to testify. So despite an admitted confusion about what exactly he was saying, she discounted what he was saying. It's difficult in those circumstances to take live testimony and compare it to a piece of paper which is admittedly somewhat opaque and then criticize the fact-finding that resulted. Well, Your Honor, in response to that question, I would point out, first of all, that Mr. Edwards pointed out the discrepancy, you know, pointed out what he believed to be the troublesome part in Dr. Bittker's report, the part that Mr. Pecheta and Ms. Butko are attempting to rely on now. And she then proceeded thereafter to address that. She canvassed Mr. Dennis, and this also dovetails into another point. When Dr. Bittker testified at the federal hearing, he testified that, you know, this is the same stuff that I presented in my report. If you look at-I might have just a moment, please, here-at page 1863 of the excerpts of the record, I had asked on cross-examination about the tailoring process that had gone on with respect to his federal testimony. And Dr. Bittker said, so, no, it wasn't tailored. I don't think anything has fundamentally changed in that report. It's pretty much the same thing I said in November of 2003, referencing, you know, his report to the State District Court. For being no-I'm sorry, Your Honor. The District Judge-the State District Judge said at the hearing, I think if you look at that paragraph, I'm not sure what Dr. Bittker is saying. I'm not sure what it means when he says, the defendant's desire to both seek the death penalty or refuse appeals are directly a consequence of the suicidal thinking and chronic stress state. And then, instead of asking him what he was saying, she went and essentially discounted it entirely. That's a strange way to proceed. Ordinarily when we have hearings, we hear people. We have people that cross-examine and the judge can make inquiries and so on. And that didn't happen. Now, it did happen in the Federal Trial Court, but this is ultimately pertinent to the question of what deference is due to the State Trial Court finding. Well, Your Honor, I think the State Trial Court finding is entitled to deference. If you look at what was said in the Federal District Court and Dr. Bittker's characterization of his testimony as being the same as he represented in November of 2003, the reference being to his report, and there being no difference between what he presented in Federal Court and what he had in his report before the State Court, there is any reason not to give it deference. And indeed, as Your Honor has already recognized, the parties decided that there wasn't any need for Dr. Bittker to be there. This is, as I was trying to suggest previously, an analogy would be a guilty plea. There doesn't have to be a knockdown-dragout fight about every little thing. Now, there have been instances, both in District Courts in this circuit and in the Eighth Circuit of Oregon, and the rest of this directly, in which courts have suggested that under these circumstances there should essentially be two counts, either through amicus or some device where you have somebody representing essentially the incompetent. The putatively incompetent Dennis and somebody representing the putatively competent Dennis. And that didn't happen here. Is there any reason why that kind of procedure is either required or preferable? Well, first of all, Your Honor, I would suggest to the Court that there wasn't any indication that Mr. Dennis... Well, first of all, the Supreme Court hasn't required that. The United States Supreme Court has not required that. It's not required by the Nevada Supreme Court. So, you know... It does seem to be that actually, as far as I could tell, it seems to be a fairly general practice. Are you aware of another case in which the issue proceeded this way, that is, you had a report from an expert who did not testify and there was no additional counsel to represent the interest of the report, essentially? What's the conclusion of the report? Well, Your Honor, I would say as a matter of routine that happens in state courts. I've attended any number of hearings where there's been some suggestion, either by counsel or concern perhaps by the court, that a particular defendant may be incompetent. And they ask for an evaluation. And the evaluation comes in and the court looks at it and says, does anybody have anything to add to it? And the parties say, yea or nay. In this case, the parties said no. Were the evaluations suggested incompetence at some time? Suggested what, I'm sorry, Your Honor? Incompetence as opposed to competence. Incompetence? I'm sorry, Your Honor. Yes, incompetence. Were the evaluations suggested as a measure of incompetence as opposed to competence? Well, I guess the point being in this case is Dr. Victor found Mr. Dennis competent. And there wasn't a suggestion of incompetency. All right. So then we're going back to the outset, which is whether there really is anything other than the Swarovski kind of standard here. Whether Reid has any additional component at all. Because if it does, there was a suggestion of incompetence, i.e., an inability to make a volitional choice, although he was cognitively perfectly aware. I'm sorry, Your Honor. I'm afraid I don't understand the question. Go ahead. Well, Your Honor. I have a question, which is obviously the competency issue is at the crux of this. But on the allowing Ms. Budko, whether she has his best interest, did the federal district court make a finding that she did have his best interest and that she was entitled to that status on that prong? Yes, the district court did, Your Honor. So what deference is that entitled to? Well, it's entitled to the deference would be a factual finding, I believe. Or actually, arguably it would be a mixed question of law and fact. Whatever factual findings would be attached to that would be addressed under the clearly erroneous standard. However, with respect to the law, that would be not entitled to deference. All right. Because it seems like it was a little bit jumped over, but the court did say those words. Yes. The court basically said, well, I don't have any doubts that you represent his best interest, but now let's go to what we're all here to talk about. So that's a little unclear to me whether that's just if you can't complain about that now. Well, Your Honor, the point is that there wasn't any factual offering about her being in his best interest. I mean, you know, Mr. Dennis had made it abundantly clear to Ms. Butko and Mr. Pachetti he did not want their involvement in this thing. I would suggest to the court that the evidence that was presented shows that she is not dedicated to his best interest. All right. So you're just basically saying the court made the finding, but there was no evidence to support that finding. That's correct. All right. Thank you. With respect to the argument with respect to Dr. Victor, what is essentially being done here or essentially what is being argued is that the court has to accept Dr. Victor's finding and has to ignore everything else that it has had before, that it has experienced during the course of the litigation involving Mr. Dennis, and that simply is not the case. And indeed, there is factual support for the finding that Dennis's decision is, in fact, volitional. Mr. Dennis has indicated that he does not want to be a doddering old man in prison. He expressed a desire to pay for his crime. He acknowledged that he must pay for the crime. If you look at the excerpt of the record, 1816, he is, in fact, aware that he could seek relief, and he is aware, and, in fact, he did instigate relief. He started a state post-conviction action, and, indeed, there was an appeal commenced on his behalf for that. He is aware of the consequences and the ramifications of his terminating that action. Indeed, Mr. Dennis expressed, if you look at excerpt of the record, 1819, foremost to me, death is preferable to spending 15 to 20 years in prison. So it is abundantly clear that, even under the third prong, that Mr. Dennis has the volitional capacity to make this decision. His letters to Mr. Pechetta and Butko that no further appeals be made are pursued. That excerpt of record, 1808, his objection is in the extreme at 1815. It's not just some casual objection. He knows that he can stop his execution. That's an excerpt of the record, 1818. If you look at the canvas, not only by the federal district court, but by the state district court, it is very clear that he understands that he has a choice in this He is aware of his grounds for this attack. Mr. Whalen, I have one question. The one thing that was never really put to Mr. Dennis is, my understanding is that at least some of the issues raised in the safe habeas petition would have gone to guilt as well as to penalty phase. And that Ms. Butko, as I remember, said at one point that she, or maybe it was the earlier lawyer, that she thought that there were some good guilt-based issues. Now, I'm not sure what they were. Maybe they were all what had just resulted in another trial, and maybe he thought that they would ultimately have been found guilty. Again, I would assume that the only defense was probably a mental health defense. But none of that was really put to him during the canvas. When he kept saying, I don't want to get all these people in prison, i.e. the possibility that he might not. There may be a perfectly good explanation for this, which may be that an insanity defense would have led them to the same place anyway. But I couldn't quite tell why that particular question was never really raised directly, when there seemed to be guilt-based issues being raised as well. Your Honor, I believe the record reflects that in the canvas done by the State District Court, and I'm looking for it right now in the record. But as I recall, the State District Court, here it is, at Excerpt of Record 1624, the court went over with Mr. Dennis the fact that Ms. Butko had filed an assignment of 33 grounds. I know that. She went over all the grounds. But the reason is, I don't want to get all of them in prison, which is what he kept saying. Nobody said to him, well, what if you had a chance to not get all of them in prison? I'm sorry, Your Honor. I think she's going back to why an NGI play wasn't entered at the state, like when people played not guilty and not guilty by reason of insanity. Are you asking why the court? I'm not asking why it wasn't entered, but I'm asking why in the canvas, when he kept repeating this, not why, because you can't tell why, but I'm observing that. That particular rational reason was not really probed because probing would have involved an inquiry into the possibility that that was not the necessary end result of the appeal, had he continued with it. That is, that throwing all of them in prison was not the necessary end result because there might be merit arguments that might have undone the guilty plea. Well, Your Honor, I would direct the court's attention to Excerpt to Record 1632. Mr. Dennis said that he acknowledged his culpability. He said, well, I'm not sure what the process is step by step, but in the end, without getting into the biblical standard of an eye for an eye or anything like that, basically, I took a life and I'm ready to pay for it with mine. And I think it's abundantly clear that Mr. Dennis is aware, as it says here, at page 1631, Mr. Dennis asked if the court has refreshed your recollection as to all of these issues that are potential areas where your lawyers could be fighting to avoid the death penalty, to overturn your conviction, or to provide a new basis upon which to perhaps revisit your case. By some other court, do you wish to give up your right to pursue any and all of these assignments of error? And he says, yes, yes, I do. Mr. Whelan, my clock may not be as accurate as the one we normally have in the courtroom, but I believe your time is about up. Would you please sum up, and then we'll hear from Mr. Pechetta. Yes, Your Honor. Just very briefly, the state court findings, in fact, are presumptively correct under 28 U.S.C. section 2254E1. The federal district court's findings, in fact, are presumptively correct under Federal Rules of Procedure 52A. And Mr. Dennis is in the same position as Mr. Rumbaugh, and although Mr. Pechetta didn't cite the ultimate holding, I would like to recite that for the court and suggest that this applies directly to this matter. Rumbaugh has striven mightily to prove his mental competence to make his legal decision. He convinced the district court who presided over the dramatic hearing. We cannot tag that finding as clearly erroneous, nor can we conclude as a matter of law that a person who finds his life situation intolerable and who welcomes an end to the life experience is necessarily legally incompetent to forego further legal proceedings, which might extend that experience. I would direct the court's attention to that at the very last part of Rumbaugh, where they also cite the United States Supreme Court case of Gilmore v. Utah. Thank you for your attention, Your Honors. All right, Mr. Pechetta. Thank you, Your Honor. I will try to make two very brief points. First, with respect to Mr. Dennis' position that he deserves to die, this is one of the important things about adversary litigation and looking at all the evidence. If you look at his statement to police, which is six excerpts of record, 937, he tells the police he should be entitled to some leniency because he did the victim a favor by killing her. He says four or five times in his statement that he put her out of her misery. Now, whether that's an actual reflection of his beliefs or not, that's something that before concluding that this is a person who is giving rational and lucid answers to the questions of a court, that's something that should be considered. On the question of the suicidal ideation that Mr. Whelan brought up, that is, of course, very important. If you look at his cross-examination of Dr. Bittker, Dr. Bittker testifies that he does not believe that everyone who wants to give up their appeals and be executed is incompetent. This is very specifically directed toward this particular individual. And as to the suicidal ideation post-imprisonment, let me just draw the court's attention to Volume 10 of the excerpts at 1599, which is Dr. Bittker's report. And I quote, he admits, this is Mr. Dennis, quote, he admits to chronic suicidal ideation since he was a child and in one report admitted to 12 suicide attempts. In my interview with the defendant, he acknowledged only four, two by carbon monoxide and two by overdose. Quote, I don't do that self-mutilating stuff, unquote. And then at 1603 he concludes he wishes to be certain of a reasonably humane death. When you go to Volume 11 at 1857, Dr. Bittker amplifies a little on that in his testimony and he says his response in terms of not really seeking any viable defense, and this goes to the question of an NGI plea, and his ready acquisition to the death penalty to me indicates a fulfillment of his desire, which I think is motivated by his depression, his desire to die. In effect, as he confessed to me that he didn't have the courage to carry through the desire, so the state becomes his vehicle for suicide. And I think this is a direct consequence of his mood disorder. I don't think that could be any clearer. So the fact that Mr. Dennis can get up and say, well, I don't have any suicidal ideation now, I think that part of all the evidence that both the state court and the district court should have considered but I think did not adequately consider is that Mr. Dennis' options to commit suicide at this point are limited to using the state to do so, and that given his aversion to doing what he calls that self-mutilating stuff, he is essentially expressing his continuing suicidal ideation by giving up his further legal proceedings. I think I'm out of time, Your Honor, by my clock. So if there are no other questions, I thank the court for its attention. I don't hear any other questions. Thank you both, counsel, for your argument in this matter, and the matter just argued will be submitted. And this concludes our session.
judges: Rymer, Berzon, Callahan